No.   23-13142

# In the United States Court of Appeals for the Eleventh Circuit

---

**ERIC C. YOUNGBLOOD, Sr. et al,**
*Plaintiffs-Appellants,*

*v.*

**CITY OF GEORGIANA, ALABAMA, et al,**
*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the Middle District of Alabama No. 2:19-cv-01072-ECM-JTA (Hon. Emily C. Marks)*

---

## BRIEF FOR APPELLANTS

---

CLAYTON P. PHILLIPS
*Counsel of Record*
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
(202) 434-5000
cphillips@wc.com

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(a), the following people and entities have an interest in the outcome of this appeal:

Adams, Jerusha T. – Magistrate Judge

Benbow, Willie – Defendant-Appellee

Castleberry, Tonya – Defendant-Appellee

City of Georgiana, Alabama – Defendant-Appellee

Coleman, Reed M. – Counsel for Defendants-Appellees

Cook, Carlton – Defendant-Appellee

Everhardt, Brad A. – Counsel for Defendants-Appellees

Hall Booth Smith, P.C. – Law Firm of Defendants-Appellees' Counsel, Robert M. Ronnlund

Hill, Hill, Carter, Franco, Cole & Black, P.C. – Law Firm of Defendants-Appellees' Counsel Reed Morgan Coleman, Brad A. Everhardt, and Randall Morgan

Marks, Emily C. – United States District Judge

Morgan, Randall – Counsel for Defendants-Appellees

Peagler, Jeremy – Defendant-Appellee

Phillips, Clayton P. – Counsel for Plaintiffs-Appellants

Rice, Richard A. – Prior Counsel for Plaintiffs-Appellants

Rogers, Beverly H. – Defendant-Appellee

Ronnlund, Robert M. – Counsel for Defendants-Appellees

Stallworth, Ricky – Defendant-Appellee

The Rice Law Firm, LLC – Law Firm of Plaintiffs-Appellants' Prior Counsel, Richard A. Rice

The Roderick Van Daniel Law Firm, LLC – Law Firm of Plaintiffs-Appellants' Prior Counsel, Roderick Van Daniel

Van Daniel, Roderick – Prior Counsel for Plaintiffs-Appellants

Wetz, Kaitlin – Counsel for Plaintiffs-Appellants

Williams & Connolly LLP – Law Firm of Appellants' Counsel, Clayton Phillips and Kaitlin Wetz

Youngblood, Eric C. – Plaintiff-Appellant

Youngblood, Melissa D. – Plaintiff-Appellant

There are no interested corporate parties.


     */s/ Clay Phillips*
CLAYTON P. PHILLIPS
  *Counsel of Record*
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *cphillips@wc.com*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument.  This appeal raises important issues of constitutional and federal statutory law, one of which is an issue of first impression in this Court:  Whether a municipal magistrate in Alabama is entitled to judicial immunity and, therefore, absolutely immune from suit.

This appeal also raises other significant Fourth Amendment issues in the summary-judgment posture.  Resolving those issues requires a thorough examination of the summary-judgment record.  Oral argument will significantly aid this Court's decisional process.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ........................................i

TABLE OF CONTENTS..................................................................ii

INTRODUCTION ..........................................................................1

STATEMENT OF JURISDICTION ..................................................3

STATEMENT OF THE ISSUES ......................................................3

STATEMENT OF THE CASE .........................................................4

    A.    Factual Background ...........................................................4

    B.    Procedural History ...........................................................9

    C.    Standard of Review...........................................................12

SUMMARY OF ARGUMENT.........................................................13

ARGUMENT ................................................................................16

I.    Rogers Is Not Absolutely Immune from Suit................................16

    A.    Immunity from § 1983 Liability Is Defined According to
        the Common Law ............................................................16

    B.    The Common Law Did Not Provide Absolute Immunity to
        Magistrates Issuing Warrants .........................................21

        1.  History Demonstrates that Officials Were Not Immune for
            Issuing Invalid Warrants ...........................................21

        2.  Magistrates Were Liable When They Acted "Maliciously"........24

    C.    Granting Rogers Absolute Immunity Conflicts with the
        Common Law and Defeats § 1983's Purposes ...............................28

ii

1. The Common Law Would Not Have Afforded Rogers Absolute Immunity................................................................28

2. Extending Absolute Immunity to Rogers Would Not Serve § 1983's History or Purposes ..........................................30

II. Officer Benbow Is Not Entitled to Summary Judgment on the Fourth Amendment Unreasonable-Seizure and State-Law Malicious-Prosecution Claims....................................................32

    A. A Jury Could Find That Officer Benbow Violated Youngblood's Fourth Amendment Right to Be Free from Unreasonable Seizures ....................................................33

        1. Officer Benbow Did Not Possess Probable Cause or Arguable Probable Cause to Arrest Youngblood...........................................36

        2. The Mere Presence of a Warrant Does Not Provide Probable Cause or Arguable Probable Cause................................................45

    B. The Right to Be Free from Unreasonable Seizures Was Cleary Established................................................................47

        1. Existing Precedent Establishes that Officer Benbow Lacked Probable Cause................................................................48

        2. The Arrest Was Obviously Unconstitutional................................50

    C. Officer Benbow Is Not Entitled to Summary Judgment on the State-Law Malicious-Prosecution Claim .................................50

III. Cook and Peagler Are Not Entitled to Summary Judgment on the Fourth Amendment Supervisory-Liability Claim ...........................51

IV. The District Court Erred When It Dismissed Melissa Youngblood's Loss-of-Consortium Claim................................................54

CONCLUSION................................................................56

# TABLE OF AUTHORITIES

Page

## CASES

*Access Now, Inc. v. Sw. Airlines Co.*,
    385 F.3d 1324 (11th Cir. 2004)............................................................20, 51, 54

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993) .....................19, 20, 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................................12

*Bailey v. United States*, 568 U.S. 186 (2013) ........................................................35

*Billings v. Lafferty*, 31 Ill. 318 (1863)..................................................................27

*Bradley v. Fisher*, 80 U.S. 335 (1871)...................................................................31

*Briggs v. Wardwell*, 10 Mass. 356 (1813)..............................................................27

*Briscoe v. LaHue*, 460 U.S. 325 (1983).................................................................19

*Burns v. Reed*, 500 U.S. 478 (1991)......................................................................25

*Butler v. Smith*, 85 F.4th 1102 (11th Cir. 2023) ...................................................36

*\*Butz v. Economou*, 438 U.S. 478 (1978).................................................18, 30, 31

*C.P. v. State*, 988 So.2d 1067 (Ala. Crim. App. 2007) .........................................40

*Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1 (11th Cir. 1995) .....................34

*Cantu v. City of Dothan*, 974 F.3d 1217 (11th Cir. 2020) ...................................51

*Carey v. Piphus*, 435 U.S. 247 (1978)...................................................................30

*Carter v. Gore*, 557 F. App'x 904 (11th Cir. 2014) (per curiam)........................42

*Chancy v. Bruno*, 679 F. App'x 864 (11th Cir. 2017) (per curiam)....................34

*Christmas v. Harris County*, 51 F.4th 1348 (11th Cir. 2022)............................51

*Dennis v. Sparks*, 449 U.S. 24 (1980)....................................................................18

*\*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ............33, 35, 37, 43, 45, 47

iv

Page

Cases—cont'd:

*Doe v. Leach*, 829 F. App'x 419 (11th Cir. 2020) (per curiam) .............43, 44, 48

*Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018) ...................................13

*Edger v. McCabe*, 84 F.4th 1230 (11th Cir. 2023) ...............................................48

*Entick v. Carrington*, 19 How. St. Tr. 1029 (CP 1765) .....................................22

*Ex parte Floyd*, 796 So.2d 303 (Ala. 2001) .........................................................55

*Fallin v. City of Huntsville*, 865 So.2d 473 (Ala. Crim. App. 2003) .................36

*Felder v. Casey*, 487 U.S. 131 (1988) ...................................................................16

*Flying J Fish Farm v. Peoples Bank of Greensboro*,
    12 So.3d 1185 (Ala. 2008) ..............................................................................55

*Garcia v. Casey*, 75 F.4th 1176 (11th Cir. 2023) ...............................33, 47, 48, 50

*Garmon v. Lumpkin County*, 878 F.2d 1406 (11th Cir. 1989) .....42, 46, 49, 50

*Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003) ................................52, 53, 54

*Grumon v. Raymond*, 1 Conn. 40 (1814) ..............................................................24

*Harris v. Hixon*, 102 F.4th 1120 (11th Cir. 2024) .............................................42

*Hornsby-Culpepper v. Ware*, 906 F.3d 1302 (11th Cir. 2018) .....................13, 45

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .......................................17, 18, 19, 30

*Jacob v. Mentor Worldwide, LLC*, 40 F.4th 1329 (11th Cir. 2022) .................33

*Johnson v. City of Atlanta*, 107 F.4th 1292 (11th Cir. 2024) ...........................33

*Jones v. Brown*, 649 F. App'x 889 (11th Cir. 2016) (per curiam) .....................47

*Kelly v. Curtis*, 21 F.3d 1544 (11th Cir. 1994) ...................................................42

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004) .......35, 43, 48, 49

Page

Cases—cont'd:

*Laskar v. Hurd*, 972 F.3d 1278 (11th Cir. 2020)............................................34, 55

*Leach v. Money*, 19 How. St. Tr. 1001 (KB 1765) ...............................................22

*Lewin v. Uzuber*, 4 A. 285 (Md. Ct. App. 1886)..................................................26

*Luke v. Gulley*, 975 F.3d 1140 (11th Cir. 2020) ...............................................34

*Malley v. Briggs*, 475 U.S. 335 (1986)...............................................18, 23, 28

*Manuel v. City of Joliet*, 580 U.S. 357 (2017) ......................................................33

*Miller v. Grice*, 31 S.C.L. 27 (S.C. 1845) ...............................................24

*Ortega v. Christian*, 85 F.3d 1521 (11th Cir. 1996) ......................................43, 44

*Ouza v. City of Dearborn Heights*, 969 F.3d 265 (6th Cir. 2020) .........39, 43, 44

*Owen v. City of Independence*, 445 U.S. 622 (1980)...........................................18

*Paez v. Mulvey*, 915 F.3d 1276 (11th Cir. 2019) ...........................................36, 47

*Pierson v. Ray*, 386 U.S. 547 (1967)...............................................17, 19

*Procunier v. Navarette*, 434 U.S. 555 (1978) ...............................................19

*Pulliam v. Allen*, 466 U.S. 522 (1984)...............................................17

*Randall v. Henry*, 5 Stew. & P. 367 (Ala. 1834) ...............................................27

*Reed v. Conway*, 20 Mo. 22 (1854)...............................................27

*Rehberg v. Paulk*, 566 U.S. 356 (2012)...............................................17, 18, 21

*Rittenhouse v. Dekalb County*, 764 F.2d 1451 (11th Cir. 1985) ......................16

*Roland v. Phillips*, 19 F.3d 552 (11th Cir. 1994)...........................................19, 20

*Sandford v. Nichols*, 13 Mass. 286 (1816) ...............................................24

Page

Cases—cont'd:

*Scheuer v. Rhodes*, 416 U.S. 232 (1974)...................................................19

*Scott v. Dixon*, 720 F.2d 1542 (11th Cir. 1983) ............................................20, 21

*Sibley v. Lando*, 437 F.3d 1067 (11th Cir. 2005) (per curiam)...........................12

*Steele v. Rauchfuss*, 157 N.Y.S. 103 (Sup. Ct. 1916)........................................26

*Stewart v. Sonneborn*, 98 U.S. 187 (1878)........................................................26

*Stubbs v. Mulholland*, 67 S.W. 650 (Mo. 1902)............................................25, 26

*Tarter v. Hury*, 646 F.2d 1010 (5th Cir. Unit A June 1, 1980)....................20, 21

*Tenney v. Brandhove*, 341 U.S. 367 (1951) ................................................18, 19

*Tillman v. Coley*, 886 F.2d 317 (11th Cir. 1989)........................................47, 50

*Tower v. Glover*, 467 U.S. 914 (1984) ............................................16, 18, 28, 30

*Turner v. Williams*, 65 F.4th 564 (11th Cir. 2023) .......................................35, 47

*United States v. Campbell*, 920 F.2d 793 (11th Cir. 1991) ...............................41

*United States v. Gonzalez*, 969 F.2d 999 (11th Cir. 1992)................................43

*United States v. Phillips*, 834 F.3d 1176 (11th Cir. 2016)....................46, 49, 50

*Washington v. Howard*, 25 F.4th 891 (11th Cir. 2022).......................35, 45, 47

*Washington v. Rivera*, 939 F.3d 1239 (11th Cir. 2019)....................................40

*Wilkes v. Wood*, 19 How. St. Tr. 1153 (CP 1763)..............................................22

*Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020)...................13, 33, 34, 35

*Williams v. Wood*, 612 F.2d 982 (5th Cir. 1980) (per curiam)...........................20

*Wilson v. Robinson*, 6 How. Pr. 110 (N.Y. 1851) ..............................................27

Page

Cases—cont'd:

*Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003) ..................................................50

*Wood v. Strickland*, 420 U.S. 308 (1975) ............................................................19

*Wyatt v. Cole*, 504 U.S. 158 (1991) ....................................................................25

*Youngblood v. Rogers*, No. 21-13617 (11th Cir. Nov. 23, 2021) ........................11

## CONSTITUTION, STATUTES, AND RULES

U.S. Const.
    amend. I ..........................................................................................1, 9
    amend. IV .............................. 1, 2, 3, 4, 10, 14, 22, 23, 24, 32, 33, 34, 35, 51, 53

28 U.S.C.
    § 1291..................................................................................................3
    § 1331..................................................................................................3
    § 1367..................................................................................................3

42 U.S.C. § 1983 ................ 3, 4, 9, 10, 13, 14, 16, 17, 18, 28, 30, 32, 33, 34, 47, 51

Federal Rule of Civil Procedure
    12........................................................................................................10
    56........................................................................................................13

Ala. Code
    § 11-47-23 ...........................................................................................54
    § 12-14-51 ...........................................................................................29
    § 13A-3-23 .....................................................................................38, 39

Ala. Code
    § 13A-11-8 .....................................................................................36, 38
    § 36-11-1 .............................................................................................31

Ala. R. Crim. P.
    2.4........................................................................................................31
    3.1........................................................................................................31

Page

Constitution, Statutes, and Rules—cont'd:

Ala. R. Jud. Admin. 18..................................................................29

**OTHER AUTHORITIES**

Akhil R. Amar, *Fourth Amendment First Principles*,
107 Harv. L. Rev. 757 (1994) ...............................................24, 28

Ala. Canons Jud. Ethics, Preamble ...................................................31

Ala. Jud. Inquiry Comm'n, Ethics Op. 92-450,
1992 WL 12659965 (Aug. 21, 1992) ...................................29, 31

Fabio Arcila, Jr., *In the Trenches: Searches and the Misunderstood
Common-Law History of Suspicion and Probable Cause*,
10 J. of Const. L. 1 (2007)...........................................................23

William Baude, *Is Quasi-Judicial Immunity Qualified Immunity*,
74 Stan. L. Rev. Online 115 (2022)............................................25

Thomas Y. Davies, *Recovering the Original Fourth Amendment*,
98 Mich. L. Rev. 547 (1999).................................................23, 24

Laura K. Donohue, *The Original Fourth Amendment*,
83 U. Chi. L. Rev. 1181 (2016) ...................................................22

2 William Hawkins, *A Treatise of the Pleas of the Crown* (1721)....................26

Scott A. Keller, *Qualified and Absolute Immunity at Common Law*,
73 Stan. L. Rev. 1337 (2021) .............................................25, 26, 29

Note, *Immunity of Quasi-Judicial Persons from Suits for Malicious
Acts*, 3 Minn. L. Rev. 515 (1919).................................................25

Richard A. Posner, *Rethinking the Fourth Amendment*,
1981 S. Ct. Rev. 49 (1981)..........................................................23

Roger Roots, *The Originalist Case for the Fourth Amendment
Exclusionary Rule*, 45 Gonz. L. Rev. 1 (2009) .........................23, 24

ix

Page

Other Authorities—cont'd:

Wright & Miller, Fed. Prac. & Proc. § 2727.2 (4th ed. Aug. 2024 update)......53

## INTRODUCTION

This case arises from the unlawful arrest of plaintiff-appellant Eric Youngblood. After Youngblood was attacked, his assailant filed a demonstrably false criminal complaint alleging that Youngblood harassed him. A city magistrate issued an arrest warrant lacking probable cause; the police officer who concluded in real time that the complaining individual was the wrongdoer executed the unsupported warrant; and the police officer's supervisors stood by and did nothing to prevent the unlawful arrest. The city unsurprisingly moved to drop all charges against Youngblood less than a month later. Youngblood sued to vindicate his First and Fourth Amendment rights.

The district court erred in conferring the city magistrate with absolute judicial immunity and granting her motion to dismiss. Judicial immunity is strong medicine. But that potency demands precise application, which must be guided by history and the common law. And courts treat absolute judicial immunity with care, requiring the most convincing showing that it applies before invoking it.

The district court did not exercise the requisite caution or engage with the history that should have informed its inquiry. Instead, on wafer-thin analysis at the motion-to-dismiss stage, it concluded that the city magistrate—who

is decidedly *not* a judge—is cloaked in judicial immunity's absolute protections for issuing unlawful arrest warrants. That runs headlong into common-law authority that subjected similar warrant-issuing officials to liability. An appropriate analysis exposes the errors in the district court's conclusion.

The district court also erred in granting summary judgment to the arresting officer and his superiors. The Fourth Amendment guards against unreasonable seizures. An arrest that is not supported by probable cause incontrovertibly violates that guarantee. And that protection does not diminish when a warrant issues.

The summary-judgment record, read in the light most favorable to the Youngbloods, showed that Youngblood was arrested pursuant to a warrant that was obviously unsupported by probable cause. The arrest warrant was supported by a single affidavit, which was filled with demonstrably false allegations. And the affiant—who only weeks prior was arrested for physically assaulting Youngblood—was hopelessly uncredible.

All of those defects were known to the arresting officer. In the district court at summary judgment, the arresting officer failed to identify any fact supporting his probable cause determination. Instead, he relied exclusively on the existence of the warrant. But a warrant not supported by probable

2

cause cannot render a seizure reasonable.  And the officer's supervisors failed to controvert Youngblood's allegation that they knowingly failed to intervene to prevent the unlawful arrest.  Summary judgment was improper.

This Court should reverse.

## STATEMENT OF JURISDICTION

Eric Youngblood sued under 42 U.S.C. § 1983, invoking the district court's federal-question jurisdiction pursuant to 28 U.S.C. § 1331.  The Youngbloods also brought several state-law claims, invoking the district court's supplemental jurisdiction under 28 U.S.C. § 1367.  The district court entered final judgment on September 20, 2023.  ECF.206.  The Youngbloods timely noticed their appeal on October 10, 2023.  ECF.207; ECF.211.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether a municipal "Clerk/Magistrate" is entitled to judicial immunity and is therefore absolutely immune from suit.

2.    Whether the district court erred in granting summary judgment on a § 1983 Fourth Amendment claim for an unreasonable seizure where a factual dispute exists regarding whether the police officer knew that the arrest warrant he executed was not supported by probable cause.

3.     Whether the district court erred in granting summary judgment on a § 1983 Fourth Amendment supervisory-liability claim where a factual dispute exists regarding whether the arresting officer's supervisors knowingly failed to intervene to prevent an unlawful arrest.

4.     Whether the district court erred in granting summary judgment on Melissa Youngblood's derivative claim for loss of consortium.

## STATEMENT OF THE CASE

### A.     Factual Background

The summary-judgment record, viewed in the light most favorable to the Youngbloods, shows the following:  Plaintiff-Appellant Eric Youngblood was hired for a property-maintenance position by Woodglen Apartments in Georgiana, Alabama.  ECF.11-11 at 1.[1]  On November 15, 2018, Youngblood arrived at Woodglen and visited Tonya Castleberry, Woodglen's manager, to deliver his pre-employment paperwork. *Id.*; ECF.182 at 2 n.2.  As he was leaving Castleberry's office, one of Woodglen's residents, Ricky Stallworth, walked in.  ECF.182-3 at 4.  According to Castleberry, Youngblood greeted

---

[1] "ECF.__" refers to the district court docket.  When an exhibit is referenced, Appellants have identified the exhibit by number separated by hyphen, for example:  "ECF.182-3."

4

Stallworth by saying "hey." *Id.*   Stallworth responded by "punching" Youngblood "in the face." *Id.*

In response, Castleberry called defendant-appellee Jeremy Peagler, then-Assistant Chief of Police for the Georgiana Police Department. ECF.199 ¶ 6. Peagler, in turn, dispatched defendant-appellee Officer Willie Benbow to the scene. *See* ECF.182-2 ¶ 6. Youngblood held Stallworth until Officer Benbow arrived and did not fight back. ECF.11-5 at 5; *see also* ECF.11-7 at 2, 0:10-0:18, 8:30-9:30.

When Officer Benbow arrived, Castleberry told him that Youngblood and Stallworth were "fighting" in her office.   ECF.11-7 at 2, 0:02-0:08. Youngblood told Officer Benbow that Stallworth had attacked him, and Stallworth accused Youngblood of having "pulled a gun on me earlier." *Id.* at 0:10-0:26. Stallworth also told Officer Benbow that Youngblood was still in possession of a handgun, "guarantee[ing]" to Officer Benbow that Youngblood had a gun in his vehicle. *Id.* at 5:00-5:10.

In response, Officer Benbow asked Youngblood whether he had a weapon.   ECF.182-2 ¶ 9.  Youngblood responded that he did not and, unprompted, invited Officer Benbow to search his vehicle for confirmation. *Id.*; ECF.11-7 at 2, 5:07-5:14. Officer Benbow accepted the invitation and searched

5

the vehicle where, as Youngblood had promised, he did not find a weapon. ECF.182 ¶ 9. Youngblood does not own a handgun, ECF.192 at 56, and other than Stallworth's statements there is no evidence that Youngblood ever possessed or had access to a handgun during the relevant time period. Although his wife, co-plaintiff Melissa Youngblood, previously owned a handgun, she had reported it stolen months before this incident. ECF.11-6 at 9.

Officer Benbow interviewed Castleberry, Youngblood, and Stallworth, but did not interview other witnesses at the scene. ECF.182-2 ¶ 11; *see* ECF.199 ¶ 4. After completing his investigation at the scene, Officer Benbow concluded that Stallworth was the aggressor and placed him under arrest. ECF.182-2 ¶ 11. In the course of the arrest, Stallworth continued to accuse Youngblood of "terroriz[ing]" people "with guns." ECF.11-7 at 2, 12:19-12:22. Officer Benbow did not credit those allegations at the time and drove Stallworth to the police department. ECF.182-2 ¶ 11. Youngblood went to the hospital to receive medical treatment for his injuries caused by Stallworth's attack. ECF.199 ¶ 5. The next day, Officer Benbow appeared before Georgiana's Clerk/Magistrate, defendant-appellee Beverly Rogers, to complete a criminal complaint against Stallworth for assault. ECF.182-3 at 18.

After he left the hospital, Youngblood went to City Hall to complete an incident report. ECF.18 ¶ 30.[2] Youngblood appeared before Rogers but did not receive a sympathetic audience. Instead, Rogers declined to allow Youngblood to sign a criminal complaint against Stallworth. *Id.* ¶¶ 39-44. Throughout their discussion, Rogers was "combative," accused Youngblood of threatening her, and stated that he was "irritating everyone talking about suing and stuff like that." *Id.* ¶ 43.

Six days after the Woodglen altercation, Stallworth appeared before Rogers to complete a written statement in which he sketched out a handful of allegations against Youngblood, mainly premised on the November 15 incident. ECF.182-3 at 8-10. About two weeks later, on December 4, Stallworth appeared before Rogers to sign a formal affidavit in support of an arrest warrant for Youngblood. *Id.* at 3.

In his sworn statement, Stallworth alleged that Youngblood had brandished a weapon at him on the morning of November 15. *Id.* Later that day, according to Stallworth, he and Youngblood crossed paths in Woodglen's

---

[2] The facts in the paragraph pertain only to Youngblood's claims against Rogers and, therefore, come from the operative complaint rather than the summary-judgment record.

7

office. *Id.* Stallworth stated that as Youngblood passed him in the office, Youngblood stated, "Mother Fucker I'm still going to kill you," which led to an "altercation." *Id.* Stallworth also alleged that Youngblood had previously threatened him and that he had seen Youngblood at the courthouse while he was swearing out the warrant. *Id.* On the basis of Stallworth's testimony alone, Rogers issued a warrant for Youngblood's arrest. *Id.*; ECF.49 at 1-2.

Several weeks after the altercation, Youngblood sought Officer Benbow's body-camera footage of the incident. ECF.182-4 at 6; *see generally* ECF.11-7 at 2. Around the same time, Youngblood learned that there was a warrant out for his arrest. *See* ECF.182 at 2. On December 13, Georgiana Chief of Police, defendant-appellee Carlton Cook, called Youngblood to inform him that the body-camera footage was available to pick up at the police station. *Id.* at 2-3. Cook informed Youngblood that no one else could recover the footage, meaning that Youngblood had to come to the police station himself. *Id.*

Youngblood explained that he was hesitant to come to the police station because there was "an illegal warrant out for [his] arrest." ECF.11-5 at 2. In response, Cook encouraged Youngblood to surrender himself to avoid having the warrant served against him. *Id.*; ECF.182-4 ¶¶ 11-12.

On December 21, Youngblood went to the Georgiana Police Department to surrender himself. ECF.199 ¶ 16. Officer Benbow arrested Youngblood pursuant to the warrant for harassment and drove Youngblood to Rogers's office. ECF.182-2 ¶¶ 17-18. Youngblood posted a property bond and was released from custody that day. ECF.182 at 3.

Less than three weeks later, on January 10, 2019, the municipal court conditionally granted the city's motion to dismiss the harassment charges. ECF.182-3 at 2. The motion to dismiss was finally granted on December 20, 2019, and all charges against Youngblood were formally dropped. *Id.*

### B.    Procedural History

Youngblood sued *pro se* in the United States District Court for the Middle District of Alabama. ECF.1. He moved for summary judgment about a month later, which the district court denied without prejudice as premature. ECF.10; ECF.13.

In the operative (second amended) complaint, which Melissa joined as co-plaintiff, Youngblood brought claims against Rogers under 42 U.S.C. § 1983 for violations of the First and Fourth Amendments for retaliation, malicious prosecution, and false arrest (Counts I-III). ECF.18 ¶¶ 88-118. Youngblood also sued Officer Benbow under § 1983 for claims based on a Fourth

Amendment unlawful seizure (Counts IV and V), and under Alabama state law for malicious prosecution (Count XI). *Id.* ¶¶ 119-40, 190-99. And Youngblood sued Cook and Peagler under § 1983 for supervisory liability (Count VII). *Id.* ¶¶ 154-62. Melissa sued all defendants for loss of consortium (Count XV). *Id.* ¶¶ 226-31. All claims were against the defendants in their individual capacities.[3]

Rogers moved to dismiss the claims against her under Federal Rule of Civil Procedure 12(b)(6). ECF.49. She asserted that she was entitled to judicial immunity under state and federal law and, therefore, was absolutely immune from suit. *Id.* at 3-4. A magistrate judge issued a report and recommendation that recited the federal standard for absolute immunity afforded to "[a] state judge," and concluded that Rogers was entitled to immunity under that standard. ECF.68 at 7-8.

---

[3] Youngblood also sued Rogers for state-law malicious prosecution and false arrest (Counts IX and X), ECF.18 ¶¶ 108-18, 171-89; Cook and Peagler for § 1983 deliberate indifference (Count VI), *id.* ¶¶ 141-53; all city defendants for conspiracy (Count VIII); all defendants for state-law conspiracy (Count XII), *id.* ¶¶ 163-70, Stallworth for state-law assault and battery (Count XIII), *id.* ¶¶ 208-17; and Castleberry for state-law slander (Count XIV), *id.* ¶¶ 218-25. The Youngbloods do not raise those claims on appeal.

Youngblood objected to the report and recommendation. ECF.72. Youngblood argued that Rogers is "not a State judge" and, because there was "no reasonable" basis for her "probable cause[] determination," she was not entitled to absolute judicial immunity. *Id.* at 2-4.

The district court adopted the report and recommendation. ECF.74. In a one-paragraph analysis, the district court repeated that "a state judge is absolutely immune from civil liability for acts taken pursuant to her judicial authority," and assumed that Rogers was a state judge acting in her judicial capacity. *Id.* at 2-3. Accordingly, the district court held that Rogers was absolutely immune from suit and granted her motion to dismiss. *Id.*[4]

Following discovery, the remaining defendants moved for summary judgment and the Youngbloods retained counsel to respond. The district court granted summary judgment, concluding that Officer Benbow was entitled to qualified immunity because he (1) was performing a discretionary function; and (2) had probable cause and arguable probable cause to arrest Youngblood based on the arrest warrant. ECF.205 at 11 & n.7. With respect to the

---

[4] Youngblood filed an interlocutory appeal seeking review of this dismissal, which this Court dismissed for lack of jurisdiction. *Youngblood v. Rogers*, No. 21-13617 (11th Cir. Nov. 23, 2021).

remaining claims, the district court concluded that Youngblood had "abandoned" the state-law malicious-prosecution claim and his claims against Cook and Peagler, and that Melissa had likewise failed to respond to the summary-judgment motion with respect to her loss-of-consortium claim. *Id.* at 2-3. Accordingly, the district court granted summary judgment on those claims without addressing the merits. *Id.*

The district court entered final judgment, ECF.206, and the Youngbloods timely appealed, ECF.207; ECF.211. This Court appointed undersigned counsel to represent the Youngbloods on appeal.

## C.    Standard of Review

To survive a motion to dismiss, the complaint need only "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). On appeal, this Court reviews *de novo* a motion to dismiss for failure to state a claim, "accept[ing] the allegations in the complaint as true" and "construing them in the light most favorable to the plaintiff." *Sibley v. Lando*, 437 F.3d 1067, 1070 (11th Cir. 2005) (per curiam). This Court will reverse unless the movant has "demonstrated beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citation omitted)

12

Summary judgment is warranted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). This Court reviews "*de novo* a district court's grant of summary judgment, viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (citation omitted). As part of its *de novo* review, this Court "consider[s] the entire record." *Doe v. Valencia College*, 903 F.3d 1220, 1229 n.7 (11th Cir. 2018).

## SUMMARY OF ARGUMENT

I.     The district court erred when it held that Rogers is absolutely immune from suit. Immunity from § 1983 liability must be rooted in the common law as it existed in 1871, when Congress enacted § 1983. Moreover, to be entitled to immunity from § 1983, the public official claiming immunity must establish that extending immunity would further § 1983's purposes. Rogers satisfies neither criterion.

Common-law principles plainly foreclose the availability of absolute immunity to Rogers. Common-law judicial immunity did not extend to clerks or

magistrates, like Rogers, who issued invalid warrants.  Instead, common-law courts regularly subjected warrant-issuing magistrates to tort liability.

Extending absolute judicial immunity to Rogers would flout § 1983's history and purpose.  Judicial immunity was tolerated at common law only because it was counterbalanced by certain procedural safeguards inherent in (and unique to) the judiciary.  Those procedural safeguards do not exist for a municipal magistrate who is not a judge.

II.    The district court erred when it granted summary judgment to Officer Benbow.  To survive summary judgment on his § 1983 malicious-prosecution claim, Youngblood must demonstrate a factual dispute regarding whether his seizure was "unreasonable" in violation of the Fourth Amendment.  And to overcome Officer Benbow's invocation of a qualified-immunity defense, Youngblood must establish a factual dispute that Officer Benbow lacked arguable probable cause for the arrest.  In the district court, Officer Benbow did not even attempt to show that he had arguable probable cause to believe that Youngblood committed harassment.  Instead, he argued only that the existence of the warrant meant that no Fourth Amendment violation occurred.

But a warrant that is not supported by probable cause is not valid and thus cannot render a seizure reasonable. Viewing the facts in the light most favorable to Youngblood, a reasonable jury could conclude that Officer Benbow lacked even arguable probable cause for the arrest.

III.   The district court also erred when it granted summary judgment to supervising officers Cook and Peagler. Neither Cook nor Peagler introduced any evidence to refute the allegation that both individuals were aware that Officer Benbow was poised to execute an unlawful arrest warrant but failed to intervene to prevent it. They thus failed to carry their burden to show the absence of a genuine dispute of material fact related to their liability as supervisory officials who knowingly failed to prevent a constitutional violation.

IV.   The district court erred in granting summary judgment to all remaining defendants on Melissa Youngblood's loss-of-consortium claim. Defendants conceded in the district court that the loss-of-consortium claim is wholly derivative of Youngblood's constitutional claims. Thus, should this Court reinstate Youngblood's claims, it should reinstate Melissa's, too. Defendants' only argument in the district court—that Melissa's claim was not timely filed—misunderstands when Melissa's claim accrued.

## ARGUMENT

### I. Rogers Is Not Absolutely Immune from Suit

In a one-paragraph analysis, the district court assumed that Rogers was a "state judge" acting "in her judicial capacity" and, accordingly, dismissed all claims against Rogers on judicial-immunity grounds. ECF.49 at 3. That short-circuited analysis doesn't withstand scrutiny. To establish immunity from a § 1983 suit, a state official must demonstrate (1) that the equivalent state official "was accorded immunity from tort actions at common law when [§ 1983] was enacted in 1871," and (2) that extending absolute immunity to that official serves "§ 1983's history or purpose." *Tower v. Glover*, 467 U.S. 914, 920 (1984).[5] The district court engaged with neither element; both counsel against granting Rogers absolute immunity.

#### A. Immunity from § 1983 Liability Is Defined According to the Common Law

Section 1983 creates a private right of action to vindicate violations of "rights, privileges, or immunities secured by the Constitution and laws" of the

---

[5] In the district court, Rogers argued that she was also entitled to absolute immunity under state law. *See* ECF.49; ECF.64. But while Alabama statutes or caselaw might immunize Rogers from suit for liability under state law, § 1983 preempts them for purposes of federal liability. *Felder v. Casey*, 487 U.S. 131, 139 (1988); *Rittenhouse v. Dekalb County*, 764 F.2d 1451, 1457 n.7 (11th Cir. 1985).

United States.  42 U.S.C. § 1983.  Congress enacted § 1983 in 1871 to redress "the wrongs being perpetrated" by state actors in the "lawlessness" following the Civil War.  *Pierson v. Ray*, 386 U.S. 547, 559 (1967) (Douglas, J., dissenting).  To achieve that end, the statute subjects to liability "'[e]very person' who acts under color of state law to deprive another of a constitutional right."  *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) (quoting § 1983).

Without limitation, § 1983 creates liability for "[e]very" state actor who violates an individual's constitutional rights.  It therefore "creates a species of tort liability that on its face admits of no immunities."  *Imbler*, 424 U.S. at 417.  But Congress did not intend to "abolish wholesale all common-law immunities" existing at the time of § 1983's enactment.  *Pierson*, 386 U.S. at 554-55.  Instead, Congress "incorporated" into § 1983 the "common-law principles of … immunity" as those immunities existed in 1871.  *Pulliam v. Allen*, 466 U.S. 522, 529 (1984).  Therefore, courts "look[] to the common law for guidance in determining the scope of the immunities available in a § 1983 action."  *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012).  In doing so, courts embrace a "functional approach" aimed at "identify[ing] those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed

17

to ensure that they are performed with independence and without fear of consequences." *Id.* (citation omitted). And the state actor invoking absolute immunity bears the burden of establishing his or her entitlement to it. *Dennis v. Sparks*, 449 U.S. 24, 29 (1980); *Butz v. Economou*, 438 U.S. 478, 506 (1978).

Courts proceed cautiously—requiring "the most convincing showing"—when considering whether the common law immunized an official from suit. *Imbler*, 424 U.S. at 434 (White, J., concurring in the judgment). The Supreme Court has warned that the court's role is only "to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice." *Malley v. Briggs*, 475 U.S. 335, 342 (1986); *Tower*, 467 U.S. at 922-23 ("We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy."). And when there is not a comparable "firmly rooted" common-law "tradition of absolute immunity," courts may not "read into" § 1983 immunities that did not exist "in 1871." *Owen v. City of Independence*, 445 U.S. 622, 637 (1980); *Malley*, 475 U.S. at 342.

Accordingly, the Supreme Court has identified only a handful of instances in which an official's absolute immunity was sufficiently "well grounded in history" such that it was incorporated into § 1983. *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). For example, legislators, judges,

prosecutors, and witnesses all are completely immunized from suit for acts taken within their respective roles. *Id.* (legislators); *Pierson*, 386 U.S. at 553-54 (judges); *Imbler*, 424 U.S. at 430-31 (prosecutors); *Briscoe v. LaHue*, 460 U.S. 325, 334 (1983) (witnesses).  By contrast, the Court has routinely declined to extend absolute immunity when the common law doesn't firmly command otherwise. *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 437 (1993) (court reporters); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) (prison officials); *Scheuer v. Rhodes*, 416 U.S. 232, 234, 247-48 (1974) (State chief executives, National Guard officers, and university presidents); *Wood v. Strickland*, 420 U.S. 308, 318 (1975) (school board members); *Pierson*, 386 U.S. at 555 (police officers).

The Supreme Court has not addressed whether an arrest-warrant-issuing municipal clerk or magistrate is entitled to absolute immunity.  This Court, in three published opinions, has identified certain limited circumstances in which a court clerk may enjoy "[a]bsolute quasi-judicial immunity."  *See Roland v. Phillips*, 19 F.3d 552, 555 & n.4 (11th Cir. 1994).  Those cases do not counsel in favor of immunity here.  To start, Rogers did not raise the quasi-judicial-immunity affirmative defense in the district court, so she has forfeited it on appeal.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th

Cir. 2004); *see* ECF.48 at 24 (pleading ten different immunities as affirmative defenses but omitting quasi-judicial immunity); *Roland*, 19 F.3d at 555 ("The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." (quoting *Antoine*, 508 U.S. at 432)).

Even had Rogers preserved the argument, absolute quasi-judicial immunity is not available here. This Court has explained that a court clerk is entitled to absolute quasi-judicial immunity "only in a narrow range of actions" when "acting in a nonroutine manner under command of court decrees or under explicit instructions of a judge." *Williams v. Wood*, 612 F.2d 982, 985 (5th Cir. 1980) (per curiam); *Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. Unit A June 1, 1980) (similar). For "all other actions," clerks enjoy "only qualified immunity." *Tarter*, 646 F.2d at 1013. Later, this Court recognized that a warrant-issuing Georgia "State Court Clerk"—who was authorized by statute to act "in the name of the Judge"—fell within the "narrow extension of absolute judicial immunity" articulated in *Williams* and *Tarter*. *Scott v. Dixon*, 720 F.2d 1542, 1546-47 & nn.8, 9 (11th Cir. 1983). Because that clerk acted as "the Judge," and because "judge[s]" "normally" issue warrants, *Scott* reasoned that the clerk was acting in his "'judicial' capacity" and entitled to immunity. *Id.* at 1547 & n.8. That "narrow extension" doesn't apply here. *See id.* at 1546.

20

Rogers was neither acting "in the name of the Judge," *id.* at 1546 n.8, nor performing an act she was "specifically required to do under a court order or at a judge's direction," *Tarter*, 646 F.2d at 1013.

Accordingly, the "scope of the immunities" available to Rogers is an open question. *See Rehberg*, 566 U.S. at 363. To answer it, this Court should "look[] to the common law for guidance." *Id.* at 362.

## B. The Common Law Did Not Provide Absolute Immunity to Magistrates Issuing Warrants

Common-law sources demonstrate that warrant-issuing municipal clerks or magistrates did not enjoy absolute immunity from suit in 1871. Instead, warrant-issuing magistrates were regularly held liable in trespass and false-imprisonment actions. At most, some courts afforded a good-faith defense. But that defense was not available if a magistrate acted with common-law "malice" when issuing the warrant. Applying those common-law rules here, Rogers is not entitled to absolute immunity.

### 1. History Demonstrates that Officials Were Not Immune for Issuing Invalid Warrants

Magistrates issuing invalid warrants were not absolutely immune from suit at common law. That conclusion finds its roots in seventeenth- and eighteenth-century English law. At that time, the law barred the Crown from

intruding "on the sanctity of the home without a warrant."  Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1195-96 (2016).  Mindful of that prohibition—and attempting to circumvent it—the Crown created the "general warrant," which "lacked specificity" of "the person to be arrested, the place to be searched, or evidence of the crime for which the individual or information was being sought."  *Id.* at 1207-08.  The Crown utilized general warrants as a means to "allow for indiscriminate search[es] and seizure[s]," and as a work-around to the warrant requirement.  *Id.* at 1196.

Because general warrants were easily susceptible to abuse, English courts quickly outlawed them.  *See id.* at 1196 (citing *Entick v. Carrington*, 19 How. St. Tr. 1029 (CP 1765); *Wilkes v. Wood*, 19 How. St. Tr. 1153 (CP 1763); *Leach v. Money*, 19 How. St. Tr. 1001 (KB 1765)).  Those courts acknowledged that general warrants would result in "a discretionary power given to messengers to search wherever their suspicions may chance to fall."  *Wilkes*, 19 How. St. Tr. at 1167.  And because that power would be "totally subversive of the liberty of the subject," courts refused to endorse it.  *Id.*

The Framers carried that animosity towards too-loose warrants into the Nation's founding.  Accordingly, they crafted the Fourth Amendment's Warrant Clause to require warrants to "particularly describ[e] the place to be

22

searched, and the persons or things to be seized."  U.S. Const. amend. IV.
However, for the century that followed, there was no Fourth Amendment ju-
risprudence—would-be civil plaintiffs had no cause of action under the Fourth
Amendment, and criminal defendants had not invoked the Amendment in pro-
ceedings against them.  Fabio Arcila, Jr., *In the Trenches: Searches and the
Misunderstood Common-Law History of Suspicion and Probable Cause*, 10
J. of Const. L. 1, 5 & n.12 (2007).  Instead, "search and seizure claims were
litigated through common law" claims like trespass and false imprisonment.
*Id.* at 5-6.  Arming citizens with these common-law rights of action reflects the
Framers' "mistrust of officialdom" and the "possibility that magistrates might
issue unreasonably broad warrants."  *See* Richard A. Posner, *Rethinking the
Fourth Amendment*, 1981 S. Ct. Rev. 49, 72 (1981); Thomas Y. Davies, *Recov-
ering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 572 n.55 (1999)
(citation omitted).

As a result, "[i]n 1871, the generally accepted rule was that one who pro-
cured the issuance of an arrest warrant by submitting a complaint could be
held liable."  *Malley*, 475 U.S. at 340.  That rule extended to "even the magis-
trates who signed invalid warrants."  Roger Roots, *The Originalist Case for
the Fourth Amendment Exclusionary Rule*, 45 Gonz. L. Rev. 1, 10 n.45 (2009).

These magistrates were regularly "held liable in the civil courts of the nine-teenth century." *Id.*; Davies, *supra* at 586 ("Because a general warrant was clearly deemed illegal by the framing era, it did not protect either the issuing magistrate or the executing officer against trespass liability."). A warrant could be invalid—and thus subject the magistrate or justice of the peace who issued it to liability—for any number of reasons, including because it was issued "without probable cause," because the magistrate lacked jurisdiction, or because the description was deficient. Akhil R. Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 780 (1994) ("executive (or quasi-judicial) magistrate" liable if he issued a warrant "without probable cause"); *Miller v. Grice*, 31 S.C.L. 27, 34 (S.C. 1845) (magistrate "answerable … for the consequences" when he knowingly issued a warrant for a crime committed in another jurisdiction); *Grumon v. Raymond*, 1 Conn. 40, 46-48 (1814) (similar); *Sandford v. Nichols*, 13 Mass. 286, 288-89 (1816) (magistrate liable when warrant was "deficient in the description" and not "particular").

> ## 2. Magistrates Were Liable When They Acted "Maliciously"

As the law evolved, some common-law courts permitted a magistrate who issued an unlawful warrant to assert a good-faith defense, which modern commentators have dubbed "quasi-judicial" immunity. *See* Scott A. Keller,

*Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1358-59 (2021).  In those courts, a magistrate was liable only if he issued the warrant with "malice."  *Id.* at 1359.  Unlike judicial immunity, common-law quasi-judicial immunity was qualified, not absolute.  *Burns v. Reed*, 500 U.S. 478, 500-01 (1991) (Scalia, J., concurring in part); Note, *Immunity of Quasi-Judicial Persons from Suits for Malicious Acts*, 3 Minn. L. Rev. 515, 517 (1919).  And common-law quasi-judicial immunity was only "immunity from liability"; it "was not an immunity from suit."  William Baude, *Is Quasi-Judicial Immunity Qualified Immunity*, 74 Stan. L. Rev. Online 115, 116, 124-25 (2022).

The requisite "malice" to overcome the good-faith defense was not a high bar.  Common-law "malice could be shown by establishing any improper or wrongful motive, and it was not essential that actual malevolence or corrupt design be shown."  Keller, *supra* at 1359 (citation omitted; alteration adopted).  At common law, the defendant's motives were "almost always" a question "for the jury."  *Wyatt v. Cole*, 504 U.S. 158, 173 (1991) (Kennedy, J., concurring); *Stubbs v. Mulholland*, 67 S.W. 650, 658 (Mo. 1902) ("[T]his inference which the jury may draw is one of fact, and not of law.").  And because malice was a jury question, it could "be inferred from the facts which go to establish the want of

25

probable cause." *Stubbs*, 67 S.W. at 658; *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878) ("Malice … may be inferred by the jury from want of probable cause[.]").  Thus, a want of probable cause in a malicious-prosecution suit—although not dispositive—could support the jury's determination that the magistrate acted with the requisite "malice" to be held liable.  *See* Keller, *supra* at 1359.[6]

The common law is rife with cases precluding quasi-judicial immunity when a plaintiff alleged that a magistrate acted "willfully and maliciously." *See, e.g.*, *Steele v. Rauchfuss*, 157 N.Y.S. 103, 106 (Sup. Ct. 1916) ("[T]he complaint does adequately aver that the evidence before the magistrate upon which the warrant was issued was insufficient to support a charge of petit larceny, there can be no doubt that the magistrate was without jurisdiction to issue the warrant and that the imprisonment was illegal."); *Lewin v. Uzuber*, 4 A. 285, 288-89 (Md. Ct. App. 1886) (arrest warrant containing only "the recital of a charge … against certain named parties … affords no protection

---

[6] *See* 2 William Hawkins, *A Treatise of the Pleas of the Crown* § 18 at 84-85 (1721) ("[A] Justice of Peace cannot well be too tender in [issuing arrest warrants prior to indictment], and seems to be punishable not only at the Suit of the King, but also of the Party grieved; if he grant any such Warrant groundlessly and maliciously, without such a probable Cause, as might induce a candid and impartial Man to suspect the Party to be guilty.").

whatever, either to the constable who acted under it, or the magistrate who issued it"); *Billings v. Lafferty*, 31 Ill. 318, 322 (1863) (reversing dismissal against bond-issuing clerk because complaint adequately alleged that the clerk acted "wrongfully and unjustly intending[] to injure the plaintiff"); *Wilson v. Robinson*, 6 How. Pr. 110, 112 (N.Y. 1851) (magistrate lacked jurisdiction and held civilly liable where "[t]he affidavit, upon which the proceedings were based, does not show that a criminal offence had been committed"); *Randall v. Henry*, 5 Stew. & P. 367, 379 (Ala. 1834) (acknowledging a "remedy against the magistrate" for "trespass" when magistrate acted maliciously); *Briggs v. Wardwell*, 10 Mass. 356, 357 (1813) ("[W]hen a magistrate … willfully abuses the power which is entrusted to him, the law will scrutinize his conduct with more severity than that of a private citizen[.]"); *cf. Reed v. Conway*, 20 Mo. 22, 44 (1854) ("Where ministerial officers are required to exercise their judgment, they are not liable for any errors in the absence of malice.").  Accordingly, even for those common-law courts that extended the good-faith defense of quasi-judicial immunity, that defense was unavailable to a magistrate who acted with the requisite common-law malice.

### C.    Granting Rogers Absolute Immunity Conflicts with the Common Law and Defeats § 1983's Purposes

Against that backdrop, the district court erred in granting Rogers absolute immunity.  With threadbare analysis, the district court summarily concluded that Rogers was a "judge" engaging in a "judicial act" and therefore was entitled to judicial immunity.  ECF.74 at 2-3.  But the district court did not consider (1) whether there was a firmly rooted common-law "tradition of absolute immunity" to which Rogers is entitled, *Malley*, 475 U.S. at 342, or (2) whether extending absolute immunity to a municipal clerk empowered to issue arrest warrants accords with "§ 1983's history or purposes," *Tower*, 467 U.S. at 920.  Properly considering those elements here warrants reversal.

### 1.    The Common Law Would Not Have Afforded Rogers Absolute Immunity

Common-law sources confirm that Rogers is not entitled to absolute immunity.  As demonstrated above, warrant-issuing "executive" or "quasi-judicial[] magistrate[s]" were regularly subjected to civil liability if they acted "maliciously."  Amar, *supra* at 780-81 (explaining common-law distinction between "executive" or "quasi-judicial[] magistrate[s]" and "judge[s] … of general jurisdiction" for purposes of immunity); *see supra* pp. 21-27.

28

Rogers fits that description to a T.  A municipal magistrate in Alabama is "the chief officer[]" of an "administrative agency," Ala. Code § 12-14-51(a); Ala. R. Jud. Admin. 18(I)(B)(2), and is "neither a judge nor a member of the judiciary," Ala. Jud. Inquiry Comm'n, Ethics Op. 92-450, 1992 WL 12659965, at *2 (Aug. 21, 1992).  Accordingly, Rogers is not insulated from liability if she exercises her "limited judicial power[]," *id.* at *1—issuing warrants—with common-law malice.

Here, Youngblood alleges that Rogers issued a warrant that she "knew" lacked "probable cause."  ECF.18 ¶¶ 46, 102.  Credited as true, the jury could therefore "infer[]" that she acted maliciously, depriving her of immunity.  Keller, *supra* at 1359.  If there were any doubt, Youngblood's complaint further alleges that Rogers acted maliciously in a modern sense—*i.e.*, with "actual malevolence"—placing Rogers well outside of common-law absolute immunity's protection.  *See id.* (citation omitted).

Youngblood alleges that, in his interaction with her before she issued the arrest warrant, Rogers was hostile and "combative," "accus[ed]" him of "'threatening' her" and other officials with legal recourse, and claimed that he "was irritating everyone talking about suing and stuff like that."  ECF.18 ¶ 43.  Based on those facts, Youngblood alleges that "Rogers maliciously issued the

arrest warrant." *Id.* ¶ 47.  Accepting those factual allegations as true, as the Court must at the motion-to-dismiss stage, Youngblood pleaded sufficient facts to establish that Rogers issued the arrest warrant maliciously.  Rogers therefore would not have enjoyed absolute immunity at common law.

> ### 2.   Extending Absolute Immunity to Rogers Would Not Serve § 1983's History or Purposes

Moreover, extending absolute immunity to Rogers would defeat "§ 1983's history or purposes." *Tower*, 467 U.S. at 920.  Congress's "central purpose" animating "§ 1983 [was] to give a remedy to parties deprived of constitutional rights" by state actors and to "deter[] such conduct." *Imbler*, 424 U.S. at 433, 442 (White, J., concurring) (citation omitted); *see also Carey v. Piphus*, 435 U.S. 247, 257 n.11 (1978).  Congress preserved certain immunities only as needed to "protect government officials in the exercise of their duties." *Antoine*, 508 U.S. at 434 n.4 (citation omitted).  And the "presumption is that qualified rather than absolute immunity is sufficient" to achieve that purpose. *Id.*  Absolute judicial immunity is an exception to the rule, tolerated only because certain "safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Butz*, 438 U.S. at 512.

The safeguards justifying absolute immunity for judges do not extend to Rogers, who is "an administrative officer" and not "a judge."  Opinion 92-450, 1992 WL 12659965, at *1-2.  For instance, judges "may be called to an account by impeachment," *Bradley v. Fisher*, 80 U.S. 335, 350 (1871), but Georgiana's citizens have no similar recourse for Rogers, *see* Ala. Code § 36-11-1(a). Judges are bound by "precedent in resolving controversies," *Butz*, 438 U.S. at 512, but Rogers has no similar restraint, *see* Ala. R. Crim. P. 3.1(a) (warrant may issue "upon a finding of probable cause").  The judicial process is safeguarded by "the adversar[ial] nature of the process, and the correctability of error on appeal," *Butz*, 438 U.S. at 512, but Rogers issues warrants in *ex parte* proceedings and an arrestee is entitled to no further review before his arrest, *see* Ala. R. Crim. P. 2.4.  And "the people of the State of Alabama have a right to expect" Alabama's judges to abide by the Alabama Canons of Judicial Ethics, Ala. Canons Jud. Ethics, Preamble, but those same ethical obligations "do not apply" to Rogers, Opinion 92-450, 1992 WL 12659965, at *1.

Every protection that provides meaningful "checks on malicious actions by judges" *Butz*, 438 U.S. at 512, is inapplicable to Rogers.  In the absence of such safeguards, granting Rogers immunity would empower her and similarly situated officials to run roughshod over citizens' constitutional rights without

31

consequence.  That would thwart, not further, § 1983's purpose of deterring constitutional deprivations at the hands of state and municipal actors.

\* \* \*

Applying common-law principles, as this Court must when evaluating a § 1983 claim, Rogers is not entitled to absolute judicial immunity.  The district court erred in concluding otherwise.  This Court should reverse.

## II. Officer Benbow Is Not Entitled to Summary Judgment on the Fourth Amendment Unreasonable-Seizure and State-Law Malicious-Prosecution Claims

Viewing the facts in the light most favorable to Youngblood, a factfinder could conclude that Officer Benbow arrested Youngblood pursuant to a warrant that any reasonable officer in his position would have known was not supported by probable cause.  Summary judgment was improper.

To survive summary judgment, Youngblood need only establish a material factual dispute as to whether Officer Benbow violated his Fourth Amendment right to be free from unreasonable seizures.  And because Officer Benbow raised a qualified-immunity defense, Youngblood must show that his asserted constitutional right was "[c]learly established … at the time of [Officer

Benbow's] conduct." *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018).[7]

In the context of Youngblood's unreasonable-seizure claim, that means Youngblood must demonstrate a factual dispute as to whether Officer Benbow lacked "arguable probable cause" for the arrest. *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023). Youngblood easily cleared that hurdle at the summary-judgment stage.

### A. A Jury Could Find That Officer Benbow Violated Youngblood's Fourth Amendment Right to Be Free from Unreasonable Seizures

Youngblood contends that Officer Benbow violated his clearly established right under the Fourth Amendment to be free from unreasonable seizures. A § 1983 malicious-prosecution claim accrues when a seizure occurs "pursuant to legal process"—such as a "warrant-based seizure"—but that process failed to "satisfy the Fourth Amendment's probable-cause requirement." *Aguirre*, 965 F.3d at 1158 (quoting *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)).[8] To establish that claim, Youngblood must prove both (1) "that he

---

[7] Youngblood does not dispute that Officer Benbow arrested Youngblood pursuant to his discretionary authority, so the qualified-immunity analysis turns on whether he violated a clearly established constitutional right. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1301 (11th Cir. 2024).

[8] In his *pro se* complaint, Youngblood styled his claim against Officer Benbow as one for "false arrest" or "false imprisonment." ECF.18 ¶¶ 119-40. Given the liberal construction owed to *pro se* pleadings, *e.g.*, *Jacob v. Mentor*

33

suffered a seizure pursuant to legal process that violated the Fourth Amendment," and (2) that he can "satisfy the common law tort of malicious prosecution." *Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020) (quoting *Aguirre*, 965 F.3d at 1157). Those requirements "significant[ly] overlap," ultimately requiring the plaintiff to "prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020).

Here, it is uncontested that the underlying state criminal proceedings terminated in Youngblood's favor. ECF.182 at 4; *Laskar*, 972 F.3d at 1295. Accordingly, Youngblood's § 1983 claim turns on the rights guaranteed by the Fourth Amendment.

The Fourth Amendment protects "against unreasonable ... seizures." U.S. Const. amend. IV. "[S]eizures are reasonable only if based on probable

---

*Worldwide, LLC*, 40 F.4th 1329, 1334 (11th Cir. 2022), the "blurr[y]" lines separating false-arrest and malicious-prosecution claims, *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 3 (11th Cir. 1995), and this Court's approval of district courts' routine practice of construing false-arrest claims—even by counseled plaintiffs—as claims for malicious prosecution, *e.g.*, *Chancy v. Bruno*, 679 F. App'x 864, 866 (11th Cir. 2017) (per curiam), this Court should construe Youngblood's claim as one for malicious prosecution.

cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (cleaned up). The Fourth Amendment's guarantees do not diminish when an arrest warrant issues—its protections "extend to seizures pursuant to legal process," such as "warrant-based seizures." *Aguirre*, 965 F.3d at 1158. Therefore—warrant or no warrant—an arrest is permissible "only if based on probable cause." *Bailey*, 568 U.S. at 192 (cleaned up); *see also Turner v. Williams*, 65 F.4th 564, 582 (11th Cir. 2023).

"To determine whether an officer had probable cause for an arrest," courts "examine the events leading up to the arrest." *Wesby*, 583 U.S. at 56-57; *see also Washington v. Howard*, 25 F.4th 891, 898-99 (11th Cir. 2022). In the probable cause analysis, courts ask whether those "historical facts" would lead "an objectively reasonable police officer" to conclude that there was "a probability or substantial chance of criminal activity." *Wesby*, 583 U.S. at 56-57.

In application, this Court has been crystal clear: "[A] probable cause determination" cannot "stand principally on the unsupported statements of interested [witnesses], when those statements have been challenged and countered by objective evidence." *Kingsland v. City of Miami*, 382 F.3d 1220, 1228 (11th Cir. 2004), *abrogated on other grounds by Aguirre*, 965 F.3d at 1159.

Thus, although it is true that "[p]robable cause is not a high bar," *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) (citation omitted), because the probable cause determination underlying Youngblood's arrest rested *entirely* on the unsupported and amply refuted statement of a single, irredeemably unreliable witness, no reasonable officer could have concluded that there was any substantial likelihood that Youngblood had committed a crime. His arrest was not supported by probable cause or arguable probable cause.

### 1. Officer Benbow Did Not Possess Probable Cause or Arguable Probable Cause to Arrest Youngblood

To assess probable cause, this Court "looks to the elements of the underlying crime." *Butler v. Smith*, 85 F.4th 1102, 1116 (11th Cir. 2023). Here, Youngblood was arrested for criminal harassment under Alabama law. In Alabama, an individual commits the crime of harassment if, "with intent to harass, annoy, or alarm another person," he (1) "[s]trikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact"; (2) "[d]irects abusive or obscene language or makes an obscene gesture towards another person"; or (3) issues "a threat, verbal or nonverbal, made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety." Ala. Code § 13A-11-8(a); *see also Fallin v. City of Huntsville*, 865 So.2d 473, 476 (Ala. Crim. App. 2003).

36

The probable cause determination underlying Youngblood's arrest was based entirely on Ricky Stallworth's affidavit. *Supra* p. 8; ECF.182-3 at 3. As explained further below, Stallworth's affidavit is teeming with untruths. Every relevant allegation is either uncorroborated or flatly contradicted by reliable evidence. Particularly given Stallworth's obvious lack of credibility, a jury could easily determine that no reasonable officer would have found probable cause based on Stallworth's specious affidavit.

Specifically, Stallworth alleged in his affidavit that on November 15, Youngblood drove through the parking lot of the apartment complex where Stallworth lived. ECF.182-3 at 3. When doing so, Youngblood allegedly brandished a handgun. *Id.* Later that day, Stallworth and Youngblood crossed paths again in the apartment manager's office. *Id.* According to Stallworth, Youngblood at that point (apparently without provocation) said "Mother Fucker I'm still going to kill you," which led to "an altercation." *Id.* Stallworth's affidavit also states that Youngblood had threatened him in the past, and that he later saw Youngblood at the courthouse. *Id.* Once contextualized with the "historical facts" known to Officer Benbow, *Wesby*, 583 U.S. at 56-57,

37

those assertions could not have given a reasonable officer probable cause to arrest Youngblood under Alabama's harassment law.[9]

a.    There was no basis to believe that Youngblood committed harassment by making "physical contact" with Stallworth. *See* Ala. Code § 13A-11-8(a)(1)(a).  To be sure, all agree that the November 15 "altercation" involved some measure of "physical contact."  But Tonya Castleberry—a neutral third-party witness—gave an oral statement to Officer Benbow and completed a written report in which she explained that Youngblood was attacked.  Whatever physical force Youngblood used to defend himself after Stallworth attacked him could not have served as probable cause for a harassment charge. *See* Ala. Code § 13A-3-23(a) (justifying use of physical force for self-defense).

Castleberry's written statement, also memorialized in Officer Benbow's police report, explained that Youngblood was at the apartment complex to "turn[] in paperwork" for a job he was set to begin.  ECF.182-3 at 4 (Castleberry Statement); ECF.11-7 at 4 (police report).  When Youngblood was "getting ready to leave … Stallworth came in."  ECF.182-3 at 4; ECF.11-7 at 4.  At

---

[9] Two of these allegations—that Youngblood drove by the courthouse and that Youngblood was in the Woodglen parking lot on the morning of November 15—could not bear on a harassment charge, *see* Ala. Code § 13A-11-8, and thus are not specifically addressed in text.

that point, "Youngblood said hey to Ricky and then Ricky Stallworth started punching Eric Youngblood in the face." ECF.182-3 at 4; ECF.11-7 at 4. Thus, Stallworth's account—which replaces the word "hey" with "Mother Fucker I'm still going to kill you" and describes the "altercation" while conspicuously omitting that it began with Stallworth "punching … Youngblood in the face"— directly contradicts Castleberry's description of the same interaction. There is no plausible basis to credit Stallworth's biased story over Castleberry's un-biased one. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 284 (6th Cir. 2020) (factual dispute whether an officer acted unreasonably in ignoring an eyewitness account from "the person with the least bias" because "eyewitness' statements … are generally entitled to a presumption of reliability and verac-ity" (quotation omitted)). According to Castleberry's version, any "physical contact" Youngblood used after being "punch[ed] … in the face" was incontro-vertibly justified, even if Castleberry described it colloquially as "fighting" in the moment. *See* Ala. Code § 13A-3-23.

Moreover, Officer Benbow's own account confirms that Stallworth's story is false. Immediately following the altercation, he rightly concluded that "Stallworth had been the aggressor." ECF.182-2 ¶ 11 (Benbow Affidavit). Of-ficer Benbow cannot reasonably have elevated Stallworth's after-the-fact

affidavit above his own contemporaneous investigation.  *See Washington v. Rivera*, 939 F.3d 1239, 1246 (11th Cir. 2019) (officers cannot "consciously ignore[] information they already possess[]").  In any event, even in the course of this litigation, Officer Benbow has never questioned his initial assessment.  *See* ECF.182-2 ¶ 11; *see also* ECF.182 at 2.

None of Stallworth's other allegations involve any physical contact.  Accordingly, no reasonable officer could have believed that probable cause existed under Alabama harassment's physical-contact prong.

b.    The affidavit contains two additional relevant allegations, both of which could conceivably be construed under either the obscene-language-or-gesture prong or the threat prong of Alabama's harassment statute:  That Youngblood brandished a firearm and that Youngblood had previously threatened Stallworth's life.  *E.g.*, *C.P. v. State*, 988 So.2d 1067, 1068-69 (Ala. Crim. App. 2007) (explaining that either "threat[s]" or "fighting words" violate Alabama's harassment statute).  Regardless of how this Court buckets those allegations, though, there is a factual dispute whether any reasonable officer could have based his probable cause determination on them.[10]

---

[10] As explained, Stallworth's allegation that Youngblood threatened him immediately preceding the altercation is directly refuted by Castleberry's more reliable testimony.  *Supra* pp. 38-39.  Thus, even if that allegation could

40

*First*, Stallworth's allegation that Youngblood "brandish[ed]" a "revolver hand gun" on the morning of November 15, ECF.182-3 at 3, is severely undermined by record evidence. Stallworth levied a similar accusation in the immediate aftermath of the altercation on the same day, when he "guarantee[d]" to Officer Benbow that Youngblood had a gun in his vehicle. ECF.11-7 at 2, 5:00-5:10. In response, Youngblood consented to a search of his vehicle, Officer Benbow searched it, and did not find a weapon. ECF.182-2 ¶ 10. Once Stallworth proved to be unreliable, a reasonable officer would not have credited his affidavit—especially making similar allegations to those already proven incorrect—without any attempts to corroborate it. *Cf. United States v. Campbell*, 920 F.2d 793, 797 (11th Cir. 1991) (district court cannot find an informant "unreliable" and then ground its probable cause determination on information "provided by that informant").

Moreover, had Officer Benbow attempted to corroborate that allegation, he would have had further reason to doubt its veracity. Youngblood did not and does not own a handgun. ECF.192 at 56. And earlier in 2018, Melissa

---

independently serve as a "threat" or "abusive or obscene language" for purposes of Alabama's harassment statute, Officer Benbow could not have based his probable cause determination upon it.

Youngblood's handgun was stolen, which she reported to police. ECF.11-6 at 3-4, 9. The police had no corroborating evidence that Youngblood had access to a handgun, much less that he brandished one at Stallworth. Even if Stallworth's dubious allegation could have provided probable cause in a vacuum, there is no excuse for Officer Benbow's failure "to take [the] obvious investigative step" to confirm whether Youngblood had access to a handgun. *See Harris v. Hixon*, 102 F.4th 1120, 1129 (11th Cir. 2024).

*Second*, Stallworth's vague allegation that Youngblood "has made threats about killing me in the past" is fatally unspecific. This Court has repeatedly held that such a "conclusory assertion that the suspect committed a crime" with no supporting details does "not allege facts sufficient to establish arguable probable cause." *Carter v. Gore*, 557 F. App'x 904, 910 (11th Cir. 2014) (per curiam); *see also Kelly v. Curtis*, 21 F.3d 1544, 1548, 1555 (11th Cir. 1994); *Garmon v. Lumpkin County*, 878 F.2d 1406, 1408-09 (11th Cir. 1989). In fact, in those cases the affidavits contained greater details than Stallworth's allegation, like the date and location of the offense, *Kelly*, 21 F.3d at 1547-48, or a description of a stolen item, *Carter*, 557 F. App'x at 909-10, and yet this Court still held them to be deficient. By contrast, Stallworth alleged that at an unknown time, in an unknown location, under unknown circumstances,

42

Youngblood threatened him in an unknown manner.  Construing those facts in the light most favorable to Youngblood, no reasonable officer could conclude that such a hazy accusation established probable cause.

c.    Taking a step back from the element-by-element minutia—and viewing the "totality of the circumstances," as the Supreme Court has commanded, *Wesby*, 583 U.S. at 56-57—a factual dispute exists whether a reasonable officer could have concluded that Stallworth's obviously biased, "unsupported," and oftentimes directly contradicted statement could have provided probable cause, *Kingsland*, 382 F.3d at 1228.

Officers are not shielded from liability when they blindly trust statements of dubious veracity, particularly when the statements are given by someone—like Stallworth—with questionable motivations.  *Doe v. Leach*, 829 F. App'x 419, 423 (11th Cir. 2020) (per curiam); *accord Ouza*, 969 F.3d at 284 ("[A] single witness' unreliable accusation is insufficient to create probable cause to arrest a person without further corroboration[.]").  Analogously, when an officer relies on an informant to provide probable cause, the officer must pressure test the informant's "veracity" and "reliability."  *United States v. Gonzalez*, 969 F.2d 999, 1003 (11th Cir. 1992).  And "corroborat[ing]" the "details" is "of significant value."  *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th

43

Cir. 1996). Applying that analogous standard here further exposes Officer Benbow's unreasonableness.

Stallworth flunks any measure of veracity. The one allegation that Officer Benbow personally vetted—Stallworth's "guarantee" that Youngblood had a gun in his car—was false. ECF.11-7 at 2, 5:00-5:10, 182-2 ¶ 10. Likewise, the affidavit's other allegations either are demonstrably false or—at a minimum—substantially undermined by record evidence of which Officer Benbow was aware. *Supra* pp. 37-42; *contra* ECF.205 at 10 (Order granting summary judgment) (assuming that the affidavit did not contain "any falsehoods, omissions, or misstatements").

Stallworth also was patently unreliable. In addition to the pattern of untruths described above, the greater context—where Stallworth was arrested for assault and completed a harassment complaint against his victim only six days later—should have caused a reasonable officer to question Stallworth's "motivations." *Doe*, 829 F. App'x at 423; *Ouza*, 969 F.3d at 284. No reasonable officer could have based his probable cause analysis on Stallworth's testimony. *See Ortega*, 85 F.3d at 1525-26.

In short: Stallworth was uniquely uncredible and Officer Benbow was uniquely well positioned to recognize it. Based on the myriad indicia of

unreliability, it strains credulity for Officer Benbow to swear that he "had no reason to question the validity of [the arrest] warrant … or the probable cause determination supporting it." ECF.182-2 ¶ 19. To the contrary, and as demonstrated above, Officer Benbow had *every* reason to question the probable cause determination underlying the warrant. His failure to do so was unreasonable.

### 2. The Mere Presence of a Warrant Does Not Provide Probable Cause or Arguable Probable Cause

Officer Benbow was unable to articulate a coherent basis for his probable cause determination in the district court. ECF.182 at 13-15. Although his summary-judgment briefing repeatedly urged that "there was probable cause for Youngblood's arrest," ECF.182 at 13-15, his explanation never once mentioned the "events leading up to the arrest" or the "historical facts" supporting that probable cause conclusion, *Wesby*, 583 U.S. at 56-57. Nor did Officer Benbow explain why the "totality of the circumstances" would have led a "reasonable officer" to conclude that there was "a probability or substantial chance of criminal activity." *Washington*, 25 F.4th at 898. Drawing "all reasonable inferences" in Youngblood's favor, a rational factfinder could conclude that Officer Benbow's inability to identify a single fact supporting probable cause means that arguable probable cause did not exist and the seizure was unlawful. *See Ware*, 906 F.3d at 1311.

45

In the district court, Officer Benbow provided two reasons why the historical facts leading to Youngblood's arrest were ostensibly irrelevant. Neither is persuasive.

*First*, Officer Benbow remarkably contended that "[n]either Stallworth's complaint, nor Rogers' probable cause determination, were related to the physical altercation that took place on November 15, 2018." ECF 182 at 2. That is wrong. Stallworth's affidavit—on which Rogers indisputably based her probable cause determination—begins with "on or about [] November 15, 2018 Eric Youngblood did," then lists the elements of harassment, and then describes what occurred "on November 15, 2018." ECF 182-3 at 3. It blinks reality to contend that the November 15 altercation was not "related" to Stallworth's complaint or the resulting warrant.

*Second*, Officer Benbow invoked the existence of the arrest warrant, thus implying that all of the facts within his knowledge were irrelevant. But this Court has previously held that a "magistrate's issuance of [an] arrest warrant" does not "conclusively establish[] the existence of probable cause." *Garmon*, 878 F.2d at 1408-09. Instead, when a warrant is not "supported by probable cause" it "is not valid" and thus "cannot render a … seizure reasonable." *United States v. Phillips*, 834 F.3d 1176, 1180 (11th Cir. 2016).

46

Accordingly, an arrest warrant creates only a "rebuttable" presumption "that probable cause existed." *Turner*, 65 F.4th at 582.  And that presumption is easily rebutted in a case like this one, where a wealth of facts lay at the feet of the officer who executes the arrest warrant to put him on notice that probable cause is nonexistent.  *See, e.g.*, *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989); *Jones v. Brown*, 649 F. App'x 889, 891 (11th Cir. 2016) (per curiam) (officer's reliance on "magistrate's probable cause determination" must be "objectively reasonable").  Because Officer Benbow "should have known that the information provided to the magistrate failed to establish probable cause," the warrant does not immunize him from liability.  *See Washington*, 25 F.4th at 898, 906; *accord Paez*, 915 F.3d at 1285 (probable cause turns on "the facts and circumstances within the officer's knowledge").

## B.    The Right to Be Free from Unreasonable Seizures Was Cleary Established

Youngblood had a "clearly established" right to be free from a seizure unsupported by probable cause in December 2018, when Officer Benbow arrested him.  *Wesby*, 583 U.S. at 63.  In a § 1983 claim for an unlawful seizure, the clearly-established-law inquiry "collapses … into a single question": Whether the arresting officer had "arguable probable cause."  *Garcia*, 75 F.4th at 1187.  "[A]rguable probable cause exists where a reasonable officer,

looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting arrests." *Edger v. McCabe*, 84 F.4th 1230, 1236-37 (11th Cir. 2023) (citation omitted). As the analysis above makes plain, viewing the facts in the light most favorable to Youngblood, no reasonable officer could have believed that the law permitted Youngblood's arrest based on Stallworth's allegations and the mere existence of a warrant. The law thus "ma[de] it obvious that [Officer Benbow's] acts violated [Youngblood's] rights." *Garcia*, 75 F.4th at 1187 (citation omitted).

Relevant here, Officer Benbow lacked arguable probable cause because (1) "existing precedent establishe[d] that there was no actual probable cause for an arrest on similar facts," and (2) Officer Benbow was "so lacking in evidence to support probable cause that the arrest was obviously unconstitutional." *Id.*

### 1.    Existing Precedent Establishes that Officer Benbow Lacked Probable Cause

As explained above, this Court has clearly held that "a probable cause determination" cannot "stand principally on the unsupported statements of interested [witnesses], when those statements have been challenged and countered by objective evidence." *Kingsland*, 382 F.3d at 1228; *see also Doe*, 829 F. App'x at 423. In *Kingsland*, a woman got into a car accident with a police

48

officer driving an unmarked police vehicle. 382 F.3d at 1223. Officers arrested the woman on suspicion of driving under the influence based principally on the testimony of the officer with whom she collided, who "claimed that [she] was at fault," and because she failed a field sobriety test. *Id.* But because the officers ignored other witnesses on the scene, *id.*, overlooked countervailing evidence, *id.* at 1224, and failed to investigate obvious alternative explanations for her having failed the field sobriety test, *id.*, this Court reversed the grant of summary judgment, *id.* at 1232. "[W]ithout further factfinding" it was "impracticable to conclude that arguable probable cause existed." *Id.* Those facts easily map onto this case where Officer Benbow reversed his earlier judgment to blindly credit Stallworth's account, ignored third-party-witness testimony, declined to interview other witnesses, overlooked evidence that undermined Stallworth's story, and failed to further investigate obvious issues like whether Youngblood had access to a handgun. *Supra* pp. 41-42.

This Court has also clearly established that an officer may not mindlessly execute a warrant in the face of obvious doubts. *See Garmon*, 878 F.2d at 1408-09; *Phillips*, 834 F.3d at 1180. Instead, this Court has held that an officer who executes an arrest warrant despite "serious doubts" and without

making any "further investigation" violates the Fourth Amendment. *Tillman*, 886 F.2d at 321.

### 2. The Arrest Was Obviously Unconstitutional

Even if this Court has not decided a case on all fours with this one for purposes of "clearly establishing" the law, Youngblood's arrest was "so lacking in evidence to support probable cause that the arrest was obviously unconstitutional." *Garcia*, 75 F.4th at 1187. At minimum, there is a factual question precluding summary judgment.

As stated, Officer Benbow did not articulate in the district court a *single* fact to support a probable cause determination. Instead, he relied entirely on the presence of a warrant. ECF.182 at 13-15. But, again, the mere presence of a warrant is not sufficient to provide probable cause. *E.g.*, *Garmon*, 878 F.2d at 1408-09; *Phillips*, 834 F.3d at 1180; *Tillman*, 886 F.2d at 321. And again, a reasonable jury could find that Officer Benbow's inability to identify a single fact supporting probable cause means that probable cause didn't exist.

### C. Officer Benbow Is Not Entitled to Summary Judgment on the State-Law Malicious-Prosecution Claim

This Court has acknowledged that a federal malicious-prosecution claim contains "the same elements required under Alabama law for the tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003). And

50

the "same facts that establish an officer is not entitled to qualified immunity also establish that [he] is not entitled to state agent immunity." *Cantu v. City of Dothan*, 974 F.3d 1217, 1236 (11th Cir. 2020) (citation omitted). Thus, for the same reasons provided above, this Court should reverse the district court's summary-judgment grant on the state-law malicious-prosecution claim.[11]

## III. Cook and Peagler Are Not Entitled to Summary Judgment on the Fourth Amendment Supervisory-Liability Claim

Youngblood alleged that Officers Cook and Peagler—Georgiana Police Department's Chief and Assistant Chief, respectively—knew that Officer Benbow was poised to execute an unlawful warrant but "failed to intervene." ECF.18 ¶ 67. In their summary-judgment motion, Cook and Peagler ignored that allegation. *See* ECF.182 at 17-19. But supervisors are liable under § 1983 "either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Christmas v. Harris County*, 51 F.4th 1348, 1355 (11th Cir. 2022). A sufficient "causal connection" exists when the supervisor "knew that the subordinates would act

---

[11] The district court held that this state-law claim was forfeited. ECF.205 at 3. But because the analysis is identical to the § 1983 malicious-prosecution claim, its "proper resolution is beyond any doubt" and this Court should exercise its discretion to reach the issue. *See Access Now*, 385 F.3d at 1332.

unlawfully and failed to stop them from doing so." *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003).

In their summary-judgment motion and supporting affidavits, neither Cook nor Peagler disclaimed that they knew Officer Benbow would act unlawfully but failed to stop him. ECF.182 at 17-19. To the contrary, both Cook and Peagler submitted sworn affidavits in which they confirmed that they were at the police station when the arrest took place. ECF.182-4 ¶ 14; ECF.182-9 ¶ 8. Neither affidavit asserts that they lacked knowledge of the arrest or attempted to intervene. *See* ECF.182-4; ECF.182-9. Conspicuously absent from the summary-judgment briefing, too, is any assertion that Cook and Peagler either did not know that Officer Benbow was poised to execute an unlawful warrant or that either of them attempted to stop him from doing so. *See* ECF.182 at 17-19.

Accordingly, although Youngblood plainly alleged that Cook and Peagler were liable for their "fail[ure] to intervene," ECF.18 ¶ 67—an allegation that is amply supported by the record, *e.g.*, ECF.11-11 ¶¶ 14-15; ECF.182-4 ¶¶ 3, 10-12, 14; ECF.182-9 ¶¶ 3, 8—Cook and Peagler failed to come forward with evidence to refute it. Instead of addressing that allegation, they deliberately addressed several arguments that Youngblood "ha[d] not even made."

52

ECF.182 at 19.  Therefore, because they failed to sustain their initial burden to come forward with evidence disproving Youngblood's allegation, summary judgment was improper.

The district court, for its part, declined to address the merits of these claims, concluding instead that Youngblood had "abandoned" them.  ECF.205 at 3.  The court granted summary judgment to Cook and Peagler without further analysis.  *Id.*  That was error.

In his summary-judgment opposition, Youngblood reaffirmed that his Fourth Amendment claims "against the individual Defendants"—including "Defendant Cook" and "Defendant Peagler"—"must survive."  ECF.197 at 4-5.  That is sufficient to invoke the claim and avoid abandonment.

In any event, the burden at summary judgment is on the movant to first "make[] out a prima facie case that would entitle him to judgment as a matter of law."  Wright & Miller, Fed. Prac. & Proc. § 2727.2 (4th ed. Aug. 2024 update).  When the movant fails to meet that threshold, the "party opposing summary judgment does not have a duty to present evidence in opposition."  *Id.*

Here, Cook and Peagler failed to make out their prima facie case.  They failed to address the allegation that Youngblood plainly made—that Peagler and Cook "knew that [Officer Benbow] would act unlawfully and failed to stop

53

[him] from doing so." *Gonzalez*, 325 F.3d at 1235; ECF.18 ¶ 67. Youngblood was therefore not obligated to respond to a ground for summary judgment that defendants did not raise. This Court should reverse the grant of summary judgment on the supervisor-liability claims against Cook and Peagler.

## IV. The District Court Erred When It Dismissed Melissa Youngblood's Loss-of-Consortium Claim

Melissa Youngblood sued for loss of consortium, which defendants conceded "is derivative of her husband's allegations." ECF.182 at 32. Therefore, if this Court reverses on any of Eric Youngblood's claims, it should similarly reverse the grant of summary judgment on the loss-of-consortium claim.[12]

In the district court, defendants contended that Melissa's claim was untimely. ECF.182 at 30-31. Alabama Code § 11-47-23 requires "[a]ll claims against the municipality … for damages growing out of torts" to "be presented within six months from the accrual thereof." Because Melissa's claim did not appear until the Second Amended Complaint—on June 1, 2020—defendants

---

[12] The district court held that this claim was forfeited. *See* ECF.205 at 2. However, because it is wholly derivative of Eric Youngblood's claims, this Court should exercise its discretion to address it. Given that it undisputedly rises and falls with Eric's claims, its "proper resolution" on the merits "is beyond any doubt." *See Access Now*, 385 F.3d at 1332.

assert that it is time barred, measuring the claim's "accrual" as the date of Youngblood's arrest, December 21, 2018. ECF.182 at 30-31.

Defendants' argument flows from a flawed premise. Melissa's claim did not accrue until December 20, 2019, and was therefore timely filed on June 1, 2020. In Alabama, a plaintiff's "cause of action" does not "accrue[]" until she "is entitled to maintain an action thereon." *Ex parte Floyd*, 796 So.2d 303, 308 (Ala. 2001) (citation omitted). As stated, "[a] loss-of-consortium claim is derivative of the claims of the injured spouse." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So.3d 1185, 1198 (Ala. 2008). Accordingly, the date of accrual for Melissa's loss-of-consortium claim is the date that Eric's malicious-prosecution claim accrued. That occurred on December 20, 2019, when the Alabama court formally dismissed the criminal complaint against him. ECF.182-3 at 2; *Laskar*, 972 F.3d at 1295 (explaining that the "favorable termination" element of a malicious prosecution is satisfied when "the criminal proceedings against the plaintiff formally end"). Melissa filed her claim within six months, on June 1, 2020. Measuring from the appropriate accrual date, her claim was timely filed. This Court should reverse summary judgment with respect to Melissa's loss-of-consortium claim as to all remaining defendants.

## CONCLUSION

This Court should reverse the district court's judgment as to Counts I, II, III, IV, V, VII, XI, and XV.

Dated: October 31, 2024                    Respectfully submitted,

    */s/ Clay Phillips*
CLAYTON P. PHILLIPS
   *Counsel of Record*
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue S.W.*
   *Washington, DC 20024*
   *(202) 434-5000*
   *cphillips@wc.com*

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Clayton P. Phillips, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 32(a)(7) and (g), that the attached Brief of Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 11,446 words.


*/s/ Clay Phillips*
CLAYTON P. PHILLIPS

October 31, 2024

## CERTIFICATE OF SERVICE

I, Clayton P. Phillips, counsel for appellants and a member of the Bar of this Court, certify that, on October 31, 2024, a copy of this Brief of Appellants was filed electronically through the appellate CM/ECF system with the Clerk of the Court.

I further certify that all parties required to be served have been served.

*/s/ Clay Phillips*
CLAYTON P. PHILLIPS

October 31, 2024